FILED IN CLERK'S OFFICE
U.S.D.C. Atlanta

DEC 2 3 2009

JAMES N. HATTEN, CLERK
By: Lenga Bankhead
Deputy Clerk

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

PHILLIP LONG DANG, D.C., P.C.
d/b/a BUFORD HIGHWAY INJURY
CENTER, individually and on behalf
of all other persons and entities
similarly situated,

     Plaintiff,

     v.

XLHEALTH CORPORATION, CARE
IMPROVEMENT PLUS GROUP
MANAGEMENT, LLC, and CARE
IMPROVEMENT PLUS SOUTH
CENTRAL INSURANCE
COMPANY,

     Defendants.

CIVIL ACTION FILE

NO. 1:09-CV-1076-BBM

## O R D E R

This matter is before the court on the Motion to Dismiss Pursuant to Fed. R.

Civ. P. 12(d) [Doc. No. 6],[1] filed by Defendants XLHealth Corporation ("XLHealth")

and Care Improvement Plus Group Management, LLC ("CIP Group"), and the

Renewed Motion to Dismiss Pursuant to Fed. R. Civ. P. 12(d) [Doc. No. 17], filed by

---

[1] After this Motion was filed, Plaintiff Phillip Long Dang, D.C., P.C., amended its
Complaint. The court relies upon the allegations of the Amended Complaint, which
supersedes the former pleading. Dresdner Bank AG v. M/V OLYMPIA VOYAGER, 463
F.3d 1210, 1215 (11th Cir. 2006) ("[T]he original pleading is abandoned by the amendment,
and is no longer a part of the pleader's averments against his adversary." (citation and
internal quotations omitted)). Accordingly, the original Motion to Dismiss Pursuant to
Fed. R. Civ. P. 12(d) [Doc. No. 6] is moot, and is DENIED as such.

Defendants XLHealth, CIP Group, and Care Improvement Plus South Central Insurance Company ("CIP") (collectively "Defendants").  Defendants have also filed a Request for Oral Argument on Their Motion to Dismiss Pursuant to Fed. R. Civ. P. 12(d) [Doc. No. 13-3].[2]

## I.      Factual and Procedural Background[3]

CIP and CIP Group are wholly-owned subsidiaries of XLHealth, a corporation that owns and operates Medicare Advantage health plans.  (Decl. of J. Lee Spruiell ¶ 3 [Doc. No. 6-3].)  NovaNet, Inc. ("NovaNet") is a healthcare network in the State of Georgia.  It contracts with healthcare providers and payors to arrange for the provision of services, supplies, and benefits to the beneficiaries of those payors.  (Decl. of Richard F. Morgan, Ex. A at 1 [Doc. No. 6-5] [hereinafter Morgan Decl.].)  Effective October 1, 2005, NovaNet entered into a contract with Care Improvement Plus of the Southeast, Inc., a healthcare plan (the "XLHealth Network

---

[2] Defendants filed their Request for Oral Argument [Doc. No. 13-3] in order to "help[] . . the Court in understanding the nature of the parties' relationship and the agreements between them[.]" (Defs.' Request for Oral Argument on Mot. to Dismiss Pursuant to Fed. R. Civ. P. 12(d) 1-2.)  The parties' numerous and lengthy filings sufficiently set out their relationship and, as such, the court does not believe oral arguments will facilitate its analysis.  Defendants' request is therefore DENIED.

[3] As noted below, the court has converted Defendants' Motion to Dismiss into one for summary judgment.  On a summary judgment motion, justifiable factual inferences are construed in favor of the nonmovant.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986).  Because the court has engaged in this required construction, this recitation of the facts does not constitute findings of fact by the court.  See In re Celotex Corp., 487 F.3d 1320, 1328 (11th Cir. 2007).

Agreement"). (Id.) With NovaNet's consent, on May 30, 2006, Care Improvement Plus of the Southeast, Inc. assigned all of its rights, liabilities, and obligations under the XLHealth Network Agreement to CIP. (Id., Ex. B.)

In June 2006, shortly after CIP acquired its interest in the XLHealth Network Agreement, NovaNet entered into another contract, a Physician Participating Agreement with ActivHealthCare, Inc. ("Activ"). (Id., Ex. C.) Activ is a Georgia corporation that contracts with health plans on behalf of healthcare providers to provide the health plans' beneficiaries with, among other things, the chiropractic services of its member-doctors. Under the terms of this Physician Participating Agreement, Activ's member-doctors provided services to the beneficiaries of those healthcare plans with whom NovaNet contracted.

Pursuant to a contractual agreement, effective January 27, 2006 (the "Dr. Dang-Activ Agreement"), Dr. Phillip Long Dang ("Dr. Dang") became a member of Activ's panel of participating chiropractors. (Declaration of Mark Brickhouse, Ex. C [Doc. No. 6-4 at 51] [hereinafter Brickhouse Decl.].) Dr. Dang, a doctor of chiropractic, solely owns and controls Plaintiff. (Affidavit of Phillip Long Dang ¶ 3 [Doc. No. 7-2] [hereinafter Dang Aff.].)

Finally, as of December 31, 2007, CIP bought out NovaNet's interest in their joint XLHealth Network Agreement. (See Morgan Decl., Ex. D.) Accordingly,

NovaNet assigned to CIP its provider contracts, including that with Activ. The Physician Participating Agreement, formerly between Activ and NovaNet, now directly linked Activ with CIP (the "Activ-CIP Agreement"). (Brickhouse Decl., Ex. A [Doc. No. 6-4 at 8].) Taken alongside the Dr. Dang-Activ Agreement, described above, this buyout closed the loop that contractually links Dr. Dang with CIP.

In November 2008, Defendants sent facsimiles (the "Faxes") to Plaintiff. (Dang Aff. ¶ 5.) These Faxes purported to be invitations to Care Improvement Plus's Provider Education Seminar. (See Compl., Ex. A.) The seminars promised to offer providers, such as Plaintiff, information regarding claims and utilization management, to demonstrate use of CIP's secure provider portal, and to afford providers and their staffs opportunities to meet Care Improvement Plus representatives. (Id.)

Plaintiff filed a "Junk Fax" claim in the Superior Court of Fulton County, Georgia, on March 10, 2009. Plaintiff alleges that the Faxes were unsolicited advertisements and, therefore, that Defendants violated the Telephone Consumer Protection Act, 47 U.S.C. § 227 ("Act" or "TCPA"). Plaintiff's putative class action suit lists three counts which seek: (1) injunctions that prohibit Defendants from further violations of the TCPA and prevent Defendants from destroying or altering any relevant evidence in their possession; (2) actual statutory damages in the

amount of $500.00 or, if the court deems Defendants' actions willful and knowing, statutory damages in the amount of $1,500.00 for each violation of the Act; and (3) attorneys' fees, pursuant to O.C.G.A. § 13-6-11.  (Am. Compl. ¶¶ 22-28.)  Plaintiff prays for the statutory damages and injunctive relief described above, certification of a class of similarly situated persons or entities, and other such relief as the court deems just.  (Id. at 10-11.)

On April 22, 2009, XLHealth and CIP Group filed the Notice of Removal to this court.  On May 20 they filed their first Motion to Dismiss.  They contend that Plaintiff's suit should be dismissed as a matter of law, because the facsimiles in question were not unsolicited, as required by the TCPA.  In support of their Motion, Defendants filed certain exhibits and requested that the court treat their Motion to Dismiss as a motion for summary judgment, pursuant to Rule 12(d) of the Federal Rules of Civil Procedure.   Meanwhile, Plaintiff attached affidavits and other exhibits to its responsive brief.

On July 21, 2009, Plaintiff amended its Complaint to include CIP as an additional defendant.  On August 5, Defendants filed the second joint Motion to Dismiss, incorporating by reference all arguments made in the first Motion.

## II.    Legal Standard

Under Federal Rule of Civil Procedure 12(b)(6), a court may grant a motion to dismiss when a complaint fails to state a claim upon which relief can be granted. As such, a Rule 12(b)(6) motion tests the legal sufficiency of the plaintiff's pleading. In its consideration of a Rule 12(b)(6) motion to dismiss, the court is ordinarily limited to the facts alleged in the complaint and any documents attached to the pleadings. Brooks v. Blue Cross & Blue Shield of Fla., Inc., 116 F.3d 1364, 1368-69 (11th Cir. 1997); see also Fed. R. Civ. P. 10(c) ("A copy of a written instrument that is an exhibit to a pleading is a part of the pleading for all purposes."). If materials outside the pleadings are presented for consideration on a motion to dismiss and the court, in its discretion, does not exclude these materials, the court must (1) treat the motion as a motion for summary judgment under Rule 56; (2) give reasonable notice to the parties that it is doing so; and (3) give the parties a reasonable opportunity to present any material they deem pertinent to the motions. Fed. R. Civ. P. 12(d); see also 2 James Wm. Moore et al., Moore's Federal Practice § 12.34[3][a] (3d ed. 2009) ("Rule 12(d) specifically gives the court discretion to accept and consider extrinsic materials offered in conjunction with a Rule 12(b)(6) motion.").

Having evaluated certain exhibits attached to the parties' filings, on December 1, 2009, the court issued an Order notifying Plaintiff and Defendants of its intent to convert the Rule 12(b)(6) Motion to Dismiss into one for summary judgment.

Summary judgment is appropriate only when the pleadings and affidavits submitted by the parties show that no genuine issue of material fact exists and that the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c)(2).  A dispute over a fact will preclude summary judgment if the dispute "might affect the outcome of the suit under the governing law." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  "The moving party bears the initial burden of informing the court of the basis for its motion and of identifying those materials that demonstrate the absence of a genuine issue of material fact." Rice-Lamar v. City of Fort Lauderdale, 232 F.3d 836, 840 (11th Cir. 2000).

Although in considering a motion for summary judgment, "[t]he evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor," Anderson, 477 U.S. at 255, the nonmovant must do more than "simply show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).  Indeed, the nonmovant must respond to a properly supported motion by presenting affirmative evidence

beyond mere allegations to show that a genuine issue of material fact does exist. Anderson, 477 U.S. at 256-57. Furthermore, the court must evaluate the evidence "through the prism of the substantive evidentiary burden" at trial. Id. at 254. A court must deny summary judgment "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id. at 248.

The TCPA prohibits any person from "send[ing] to a telephone facsimile machine[] an unsolicited advertisement[.]" 47 U.S.C. § 227(b)(1)(C). The Act defines "unsolicited advertisement" as "any material advertising the commercial availability or quality of any property, goods, or services which is transmitted to any person *without that person's prior express invitation or permission*, in writing or otherwise." 47 U.S.C. § 227(a)(5) (emphasis added). Whether a facsimile was expressly invited or solicited is a matter of law, to be determined by a court. See Travel 100 Group, Inc. v. Mediterranean Shipping Co. (USA), 383 Ill. App. 3d 149, 159, 889 N.E.2d 781, 790 (2008); Travel Travel, Kirkwood, Inc. v. Jen N.Y. Inc., 206 S.W.3d 387, 389 (Mo. Ct. App. 2006). The Federal Communication Commission ("FCC" or "Commission"), in rules promulgated to implement the TCPA, explicitly noted that "[i]n the event a complaint is filed, the burden of proof rests on the sender to demonstrate that permission was given." Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991; Junk Fax Prevention

Act of 2005 [hereinafter Implementing the TCPA (2006)], 71 Fed. Reg. 25967, 25972 (May 3, 2006).

## III.   **Analysis**[4]

Defendants argue that the court should bifurcate the TCPA's "unsolicited advertisement" language and, without evaluating whether the Faxes were in fact advertisements, deem them not unsolicited. They argue that Plaintiff, through the contracts that define its relationship with Defendants, expressly permitted Defendants to fax invitations to the informational seminar. The Motion points to specific sections of the Activ-CIP Agreement, which, Defendants contend, when

---

[4] The court has subject matter jurisdiction over this case pursuant to the Class Action Fairness Act, Pub. L. 109-2, 119 Stat. 4 (2005). In their Notice of Removal [Doc. No. 1], Defendants contend that this court has both federal question jurisdiction and diversity jurisdiction over this matter. In Nicholson v. Hooters of Augusta, Inc., 136 F.3d 1287, modified, 140 F.3d 898 (11th Cir. 1998), the Eleventh Circuit concluded that when Congress enacted the TCPA it "intended to assign [a] private right of action to state courts exclusively." Id. at 1289. The Seventh Circuit has challenged Nicholson's rationale in light of two subsequent Supreme Court decisions, Grable & Sons Metal Products, Inc. v. Darue Engineering & Manufacturing, 545 U.S. 308 (2005), and Breuer v. Jim's Concrete of Brevard, Inc., 538 U.S. 691 (2003). See Brill v. Countrywide Home Loans, Inc., 427 F.3d 446, 450 (7th Cir. 2005). However, the court need not decide the effect of Grable and Breuer on Eleventh Circuit precedent. Nicholson only limited federal court jurisdiction over TCPA cases brought under 28 U.S.C. § 1331, federal question jurisdiction. As noted by both the Fifth and Second Circuits, while the TCPA may bar a party from asserting federal question jurisdiction, a court can still exercise diversity jurisdiction for claims brought pursuant to the TCPA's private cause of action. See Gene & Gene LLC v. BioPay LLC, 541 F.3d 318, 324 n.6 (5th Cir. 2008) (distinguishing Chair King, Inc. v. Houston Cellular Corp., 131 F.3d 507 (5th Cir. 1997), a case on which Nicholson relied); Gottlieb v. Carnival Corp., 436 F.3d 335, 343 (2d Cir. 2006); see also US Fax Law Ctr., Inc. v. iHire, Inc., 476 F.3d 1112, 1117 (10th Cir. 2007) (holding that though the TCPA does not allow for federal question jurisdiction, "eliminating diversity jurisdiction over TCPA claims would produce odd results").

considered in light of the Dr. Dang-Activ Agreement, invite Defendants to send facsimiles of the sort Plaintiff received in November 2008.

Plaintiff has not offered evidence that calls into question the underlying material facts of the case. Instead, Plaintiff argues that, as a matter of law, Defendants' argument must fail. Plaintiff first asserts that the Motion does not demonstrate, as required by the TCPA, that the facsimiles were not advertisements. (See Pl.'s Br. in Opp'n to Defs.' Mot. to Dismiss Under Rule 12(b) 6-8 [hereinafter Opp'n].) Plaintiff argues that "unsolicited" cannot be separated from the statutory term that it modifies, "advertisement." Because they have not presented any evidence on this issue, Plaintiff contends, Defendants have not met their threshold evidentiary burden, a shortcoming fatal to their Motion.

The court disagrees. Even if the court were to assume that the Faxes are advertisements, whether or not they were solicited remains an essential element of a TCPA claim. See Hinman v. M & M Rental Ctr., Inc., 596 F. Supp. 2d 1152, 1158 (N.D. Ill. 2009) (describing the nature of faxes as advertisements and the fact that the faxes were unsolicited as two separate elements that plaintiffs must prove under the TCPA). This conclusion is buttressed by a FCC Reconsideration Order that altered the rules by which the Commission implements the TCPA. When discussing what constitutes an unsolicited facsimile advertisement, the agency

separately listed and analyzed the element of "Prior Express Invitation or Permission."  See In re Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991 [hereinafter Implementing the TCPA (2003)], 18 F.C.C.R. 14014, 14126-30 (2003); see also Implementing the TCPA (2006), 71 Fed. Reg. at 25972.

Having segregated the issue of whether a fax is solicited from whether it is an advertisement, the essence of Defendants' Motion boils down to whether the specific documents that Plaintiff received in November 2008 were of the sort that Plaintiff expressly invited or permitted Defendants to fax. (See Defs.' Reply in Further Supp. of Mot. to Dismiss Compl. 9-10 ("Defendants only . . . sen[t] the Plaintiff the type of faxes that Plaintiff consented to receiving.") [hereinafter Reply].) The court therefore focuses its analysis on the definition of "prior express invitation or permission" and whether, under the facts of this case, Plaintiff in fact solicited faxes that, Defendants themselves characterize as "directed [by CIP] to health care providers[,]" in order to "Seek attendance at a seminar to educate providers regarding 'claims and utilization management topics' and to demonstrate claims processing procedures on the 'secure provider portal,' all information indisputably related to CIP's health plan." (Id. at 6.)

To demonstrate prior express invitation or permission, Defendants rely upon the text of paragraphs 2F, 2G, and 2I of the Dr. Dang-Activ Agreement. They contend that 2G authorizes Activ to negotiate contracts with payors, such as CIP, on Plaintiff's behalf. (See Defs.' Mem. of Law in Supp. of Mot. to Dismiss Compl. 5 [Doc. No. 6] [hereinafter Mem. in Supp. of Mot.].) Paragraphs 2F and 2I, meanwhile, authorize Activ to enter into these agreements and also oblige Dr. Dang to abide by their terms. (Id.) Defendants further argue that the Activ-CIP Agreement was the very type of contract which Dr. Dang authorized Activ to enter on Plaintiff's behalf. As such, the terms of the Activ-CIP Agreement bind Plaintiff to comply with CIP's policies, procedures, notices, and bulletins, (id. at 7-8 (citing Activ-CIP Agreement § II.A.2)) and require Plaintiff to "participate, cooperate, and comply with [certain] Programs [to] be developed by [CIP] with input by [Plaintiff] in order to provide effective disease management benefits to Medicare Members[,]" (id. at 8 (quoting Activ-CIP Agreement § II.A.8)). The Activ-CIP Agreement also obligates CIP to communicate plan requirements to Dr. Dang and permits CIP to issue certain communications via facsimile. (Id. (citing Activ-CIP Agreement §§ II.B.1, III.I).) In combination, Defendants conclude, these provisions constitute prior express invitation or permission to send the Faxes.

Given the dearth of case-law on point, the exact parameters of "prior express invitation or permission" are ambiguous. Defendants attempt to define the phrase through analogy to an Illinois Appellate Court opinion, <u>Travel 100 Group, Inc. v. Mediterranean Shipping Co. (USA)</u>, 383 Ill. App. 3d 149, 889 N.E.2d 781. After receiving advertisements via facsimile, Travel 100 Group ("Travel 100") filed suit against Mediterranean Shipping Co. ("MSC"), alleging violation of the TCPA. MSC defended against the claim on the grounds that Travel 100 consented to receiving such advertisements. Travel 100 was a member of a network of travel agents, the International Airlines Trade Agent Network ("IATAN"). As part of its membership, Travel 100 submitted its contact information for inclusion in the IATAN database and even authorized dissemination of its fax number to third party travel suppliers, including organizations like MSC. <u>See id.</u> at 149-51, 889 N.E.2d at 782-84. The Illinois court held that Travel 100's conduct and communications with IATAN constituted "express permission and invitation for advertisements to be sent by third parties, i.e., travel suppliers such as MSC." <u>Id.</u> at 158, 889 N.E.2d at 789. Defendants argue that, when considered in light of the non-contractual third party relationship between Travel 100 and MSC, the contractual relationship between Dr. Dang and CIP supports the conclusion that Plaintiff "[e]ven more clearly . . . gave [its] prior express permission to being

contacted by CIP, including being contacted via facsimile." (Mem. in Supp. of Mot. 16.)

However, Travel 100 is distinguishable from this case. In its communication with IATAN, Travel 100 explicitly authorized dissemination of its fax number to third party travel-industry suppliers, such as MSC. Travel 100, 383 Ill. App. 3d at 154, 889 N.E.2d at 786. On three occasions, Travel 100 verified its contact information with IATAN "for use by industry customers or industry participants." Id. at 155, 889 N.E.2d at 787 (internal quotations omitted). The court summarized the communications which, in toto, constituted express invitation or permission: (1) "providing [IATAN] with its contact information, including its fax number, in several documents, including a form authorizing IATAN to release that information 'to any industry supplier that may wish to use [Travel 100's] services[,]'" id. at 159-60, 889 N.E.2d at 790; (2) providing its contact information for inclusion in a database that IATAN *explicitly* stated was designed to "aid in the administration of IATAN programs to provide contact information to other industry participants[,]" id. at 155, 889 N.E.3d at 787 (internal quotations omitted); and (3) completing a questionnaire that encouraged IATAN members to update their contact information because it "assures that suppliers will direct relevant

-14-

promotions and . . . trip information to our participants[,]" id. at 159, 889 N.E.3d at 789 (internal quotations omitted).[5]

These and other such correspondences clearly "reveal[] that Travel 100 approved the inclusion of its contact information in the IATAN database, and . . . signed and returned documents that expressly stated the information would be provided to travel-industry suppliers, thus inviting communications from those businesses." Id. at 154, 889 N.E.2d at 786.  As such, Travel 100 clearly authorized third party travel-industry suppliers (such as MSC) to send communications of the type sent (advertisements) and to do so in the form in which they were sent (by fax).  Accordingly, "as a matter of law, Travel 100 expressly invited and permitted the faxed advertisements." Id. at 159, 889 N.E.2d at 790.

By contrast, to demonstrate prior express invitation or permission, Defendants rely upon a series of contractual agreements between a number of different parties.  Meanwhile, the terms of these contracts are not nearly as explicit as the releases issued by Travel 100, with regard to either the nature of the

---

[5] The court also noted that, even after filing suit and "despite Travel 100's stated objections to the faxes," its office manager signed and returned a document that stated: "As owner/manager of the location . . . [t]he undersigned hereby certifies and acknowledges that we consent to receive travel information and *travel-related facsimile communications[] . . . including material advertising the commercial availability or quality of property, goods, or services . . . at the fax number(s) . . . in this recertification*." Travel 100, 383 Ill. App. 3d at 155 n.3, 889 N.E.2d at 787 n.3 (emphasis added).

documents to be sent or the medium through which they would be sent. Because Defendants' argument so heavily relies on certain contractual provisions of the Activ-CIP and Dr. Dang-Activ Agreements, it is useful to consider the broader context of those brief excerpts Defendants include in their memorandum of law.

As Defendants contend, Paragraph 2G of the Dr. Dang-Activ Agreement authorizes Activ to negotiate contracts on Dr. Dang's behalf. However, the primary purpose of this paragraph is not to enable Activ to authorize CIP or other payors to fax invitations to seminars. Instead, as evidenced by its very title, the bulk of this paragraph's text relates to methods by which providers can bill and collect payments for services rendered to plan beneficiaries. (Dr. Dang-Activ Agreement ¶ 2G.)

Also, Defendants' characterization of the nature of Paragraphs 2F and 2I is not accurate. Again, the letter of the paragraphs does authorize Activ to enter into contracts on Dr. Dang's behalf and obliges Dr. Dang to abide by the terms of these contracts. However, the language of Paragraph 2F that immediately follows the portion quoted by Defendants, (Mem. in Supp. of Mot. 5), specifies the nature of Dr. Dang's obligations. This portion of Paragraph 2F, not quoted by Defendants, does not speak to attendance at seminars. Instead it states: "Provider shall be obligated by the terms of the Payor Contract *to provide Medically Necessary services to*

-16-

*Beneficiaries* as provided in the Payor Contracts and this Agreement." (Dr. Dang-Activ Agreement ¶ 2F.) The paragraph goes on to authorize Activ, in its discretion, to require Dr. Dang to provide Activ's agents with information related to his fee schedule and to make certain adjustments to the fee schedule. (Id.) Paragraph 2F also states that Activ may authorize Dr. Dang to separately negotiate his fees directly with a payor. Id. Nowhere does it mention the communication of information from payors to Dr. Dang.

Even if the court concludes that Paragraph 2I of the Dr. Dang-Activ Agreement binds Plaintiff by all the terms of Activ's contract with NovaNet (which was bought out by CIP, which acquired an interest in the contract as assignee of Care Improvement Plus of Southeast, Inc.'s rights), it would be a stretch to consider the terms of the Activ-CIP Agreement as expressly authorizing CIP to fax Plaintiff an invitation to attend an informational seminar. Defendants cite to certain contractual language which, when viewed in isolation from the surrounding text, seems to indicate that Activ authorized CIP to fax providers documents of the sort at issue in this case. Contra Fix v. McAllister, 273 Ga. App. 463, 466, 615 S.E.2d 547, 550 (2005) (eschewing interpretation of contract terms in isolation from the contract's broader context). When considered within a broader context, the sections of the Activ-CIP Agreement on which the Motion relies—Sections II.A.2, II.A.8,

II.B.1, and III.I, (see Mem. in Supp. of Mot. 7-8) – do not support the conclusion that Plaintiff expressly invited Defendants to send the Faxes.

Section II.A.2 obligates providers to comply with bulletins and notices that set out "Plan Requirements[.]" (See Activ-CIP Agreement § II.A.2.) But, it is at best tenuous to conclude that an invitation to attend a seminar is, in fact, a document designed to implement a Plan Requirement. Further, even if the court considers these faxed invitations notices or bulletins designed to assure compliance with a new "Quality Improvement and Utilization Management Program[] . . . developed . . . to provide effective disease management benefits to Medicare Members[,]" as set out in Section II.A.8, the court does not agree that Plaintiff expressly invited or permitted CIP to forward these documents via facsimile.[6] In essence, Defendants have argued that Section II.B.1, which obligates Defendants to communicate "Plan

---

[6] Defendants argue, without citing to authority, that "the language of the statutory definition of an 'unsolicited advertisement' – which contains no reference to permission to receive an advertisement by fax – makes clear that the permission to receive the alleged advertisement by *any method* takes the alleged advertisement outside the statutory ambit." (Mem. in Supp. of Mot. 13 n.7. (emphasis added)). The court rejects this conclusion. It is true that the definition of unsolicited advertisement, as provided in 47 U.S.C. § 227(a), a section that merely defines terms used in the TCPA, does not mention facsimiles. However, Plaintiff complains of a violation of § 227(b)(1)(C), which explicitly forbids "use [of] any telephone facsimile machine, computer, or other device to send, *to a telephone facsimile machine*, an unsolicited advertisement[.]" 47 U.S.C. § 227(b)(1)(C) (emphasis added). Further, as will be discussed below, when it enacted the TCPA, Congress expressed a specific desire to prevent cost-shifting advertising practices, such as faxing unsolicited advertisements. Accordingly, in order for the sender to avoid liability under § 227(b)(1)(C), legislative intent suggests that recipients must understand that they have authorized transmission of an advertisement in facsimile form.

*Requirements*[,]" (emphasis added), to providers, also requires Defendants to send an educational seminar invitation—a document that in no way suggests that a response, let alone attendance, is required. (See Compl., Ex. A.)

To establish the textual hook with which Defendants justify their choice of communication medium, Defendants cites to a paragraph of the Activ-CIP Agreement that authorizes CIP to deliver "notice[s] . . . [and] document[s] to be given hereunder" via facsimile. (Activ-CIP Agreement § III.I.)  However, this section goes on to specifically state that any notice or document sent to the "Participating Provider" is to be forwarded to Activ, providing Activ's mailing address while not including a fax number. (Id.)  Accordingly, the plain language of the contract indicates that even if Defendants were permitted to send documents to providers, they should have sent the document to Activ and not Plaintiff.

The synthesis of seven contractual phrases and paragraphs, selected from the thirty or so pages that comprise two contracts — contracts which link Plaintiff to CIP only through two additional contracts — does not constitute express invitation or permission.  The contractual provisions on which Defendants rely in this case are a far cry from Travel 100's explicit authorization, by which it permitted IATAN to disseminate the travel agent's contact information and fax number to "assure[] that

-19-

suppliers will direct relevant promotions and . . . trip information to . . . participants." Travel 100, 383 Ill. App. 3d at 152, 889 N.E.3d at 785.

As noted by the Missouri Court of Appeals, the statute's plain language, which defines unsolicited as "without that person's prior express invitation or permission," 47 U.S.C. § 227(a)(5), indicates that anything less than express consent is insufficient. Travel Travel, Kirkwood, 206 S.W.3d at 392. As such, consent must be "clearly and unmistakably stated" and not "gathered only by implication or necessary deduction from the circumstances, the general language, or the conduct of the parties[.]" Id.

Defendants contend that the standard set out by the Missouri court establishes an "'unworkable' situation whereby express consent sufficient to meet the TCPA could not realistically be established." (Mem. in Supp. Mot. 16 (citing Travel 100, 383 Ill. App. 3d at 158, 889 N.E.3d at 789).) However, adopting the Defendants' position in this case would be inconsistent with Congressional intent. As noted by the FCC, in rules it promulgated to implement the TCPA:

> [O]ne of Congress'[s] primary concerns was to protect the public from bearing the costs of unwanted advertising. . . . Because of the cost shifting involved with fax advertising, Congress . . . prohibited unsolicited faxes without the prior express permission of the recipient. Unlike the do-not-call list for telemarketing calls, Congress provided no mechanism for opting out of unwanted facsimile advertisements. Such an opt-out list would require the recipient to possibly bear the cost of the initial facsimile and inappropriately place the burden on the

> recipient to contact the sender and request inclusion on a 'do-not-fax'
> list. . . . *The Commission believes that given the cost shifting and interference
> caused by unsolicited faxes, the interest in protecting those who would
> otherwise be forced to bear the burdens of unwanted faxes outweighs the
> interests of companies that wish to advertise via fax.*

Implementing the TCPA (2003), 18 F.C.C.R. at 14128-29 (footnotes omitted).  For

this reason, the FCC has clarified that mere membership in a trade organization or

even publication of one's fax number is not sufficient to constitute "prior express

permission or invitation absent the recipient's express consent to use the telephone

facsimile number[.]"  Rules and Regulations Implementing the Telephone

Consumer Protection Act of 1991, 10 F.C.C.R. 12,391, 12,408 (1995); see also

Implementing the TCPA (2003), 18 F.C.C.R. at 14129. Accordingly, the Commission

has defined express permission as permission demonstrating that "the consumer

*understand[s]* that by providing a fax number, he or she is agreeing to receive *faxed*

advertisements." Implementing the TCPA (2003), 18 F.C.C.R. at 14130 (emphasis

added); see also Hinman, 596 F. Supp. 2d at 1160  (holding that voluntarily

providing fax numbers to data compilers so that the compilers could periodically

fax marketing materials "does not establish that any of the plaintiffs gave

*meaningful (i.e., knowing) consent*" to receive faxed advertisements from a third party

that purchased the contact information from the compilers (emphasis added)).

Dr. Dang provided Activ with Plaintiff's fax number and Dr. Dang entered into the Dr. Dang-Activ Agreement. Meanwhile, Defendants are only linked to Dr. Dang through a series of contracts, by way of multiple assignments and a buyout. For reasons discussed above, the court concludes that the Dr. Dang-Activ and Activ-CIP Agreements, which make vague reference to bulletins and notices and arguably permit submission of these documents to Activ via facsimile, do not confer express invitation or permission. Reasonable jurors could find that Plaintiff never understood its actions to constitute solicitation of the documents at issue in the form in which they were sent, i.e., by fax.

## IV.   Summary

For the foregoing reasons, Defendants' Motion to Dismiss Pursuant to Fed. R. Civ. P. 12(d) [Doc. No. 6], Renewed Motion to Dismiss Pursuant to Fed. R. Civ. P. 12(d) [Doc. No. 17], and Request for Oral Argument on Their Motion to Dismiss Pursuant to Fed. R. Civ. P. 12(d) [Doc. No. 13-3] are DENIED.

IT IS SO ORDERED, this 23rd day of December, 2009.

BEVERLY B. MARTIN
UNITED STATES DISTRICT JUDGE

-22-